UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| RICHARD REYNODS, <br>     Plaintiff, | : <br> : <br> : |
| v. | :     Case No.: 3:21-cv-01064 (SRU) <br> : |
| ANGEL QUIROS, KRISTINE BARONE, <br> SCOTT SALIUS, WILLIAM MULLIGAN, <br> DAMIEN DORAN, JOSHUA BURNS, <br> DAVID MAIGA, CRAIG WASHINTON, and <br> ROGER BOWLES <br>     Defendants. | : <br> : <br> : <br> : <br> : <br> :     April 6, 2022 |

# FIRST AMENDED COMPLAINT

## INTRODUCTION

1. When Plaintiff Richard Reynolds won his case in the Second Circuit, the defendants responded by retaliating against him and all but nullifying their compliance with the orders of this Court and the Second Circuit. This case seeks damages and injunctive relief to end that retaliation for Plaintiff's exercise of his Constitutional rights and to remedy Defendants' unlawful conduct.

2. As described below, promptly after the Second Circuit ruling Defendants, bizarrely, purported to consider Mr. Reynolds an escape risk and placed him on "High Security" status, with attendant severe restrictions, and they have kept him in that status to this day. They have also withheld his property for no plausible reason; and most recently they transferred him for undisclosed reasons to a facility where his conditions closely resemble those at Northern C.I., except that he is not allowed to have items he relied on at Northern to help him cope with his isolation.

1

## JURISDICTION AND PARTIES

3. Plaintiff, Richard Reynolds, is the plaintiff in *Reynolds v. Quiros*, No. 13cv1465(SRU) ("13cv1465"), *see Reynolds v. Arnone*, 402 F. Supp. 3d 3 (D. Conn. 2019). He brings this case pursuant to Title 42 United States Code Section 1983 and the First, Eighth, and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and its inherent authority to enforce its own orders.

4. The defendants are as follows. Each defendant is sued individually and in her or his official capacity.  At all relevant times each defendant acted under color of State law:

    a. Angel Quiros is Commissioner of Connecticut's Department of Correction ("DOC"). He had and has oversight and final authority with respect to all the conduct complained of.

    b. William Mulligan is the Deputy Commissioner of the Department of Corrections. He had and has oversight and authority with respect to conduct complained of and in addition as explained below he has been personally involved in the unlawful conduct.

    c. Kristine Barone is the Warden of MacDougall-Walker Correctional Institution. She had and has oversight and authority with respect to conduct complained of and personally participated in some of it, as described below.

    d. Scott Salius is a Captain in the Department of Corrections and had direct supervisory participation in some of the conduct complained of.

    e.  Damian Doran is Deputy Warden at MacDougall-Walker C.I. He had and has oversight and authority with respect to conduct complained of and personally participated in some of it, as described below.

    f.  David Maiga is the Director of Offender Classification Population Management of the Department of Corrections. Along with other defendants as described below, he had and has responsibility for placing and keeping Mr. Reynolds in a "High Security" status.

    g.  Craig Washington was the Acting Warden at Northern CI and is now Warden at Garner Correctional Institution. He had and has oversight and authority with respect to conduct complained of and participated in some of it, as described below.

    h.  Roger Bowles was the Warden at Northern CI at times relevant to this complaint. He had oversight and authority with respect to conduct complained of and personally participated in some of it, as described below.

    i.  Property Officer Burns is the property officer at MacDougall-Walker. He kept Mr. Reynolds's property from him.

## FACTS

### Facts Relating to Mr. Reynolds's Placement on High Security Status

5. On March 11, 2021, the Second Circuit ruled in *Reynolds v. Quiros,* 990 F.3d 286 (2d Cir. 2021), affirming this Court's orders directing that Mr. Reynolds be removed from "Special Circumstances High Security" and be treated comparably to two other former death row inmates, Terry Johnson and Jose Santiago.

6. Four days later, on March 15, a correctional officer at Northern CI reported that while inventorying Mr. Reynolds's cell that morning he seized items including a small (about 1x2") white box containing a Nintendo battery replacement kit. The kit included what the officer described as a "2in blue handle phillips screwdriver."

7. As the officer's report indicates, the screwdriver is tiny: the blade is about ¾" long, with a 1/16" diameter. It weighs approximately 0.05 ounces, less than the weight of a penny. It is only suitable for use with tiny screws or as a child's toy. The kit, including the screwdriver, had been acquired years before with the knowledge and permission of Northern CI staff and had been observed by staff without incident during many prior shakedowns of Mr. Reynolds's cell in the intervening years.

8. Four days later, on March 19, Defendant Washington, then Acting Warden at Northern, recommended to Defendant Maiga, DOC's head of prisoner classification, that Mr. Reynolds be classified in High Security Status. In his recommendation he called the screwdriver an "escape related tool" and, later, "escape tools/weapons."  He did not mention its size. He added: "... with the imminent closing of Northern CI it is reasonable to believe that this significant change in institutional and personal status is also reason to increase level of supervision."

9. Five days later, on March 24, Defendant Maiga wrote the new Warden, Defendant Bowles, that "this office concurs with your recommendation concerning the above inmate's placement on High Security status." He added, "Please hold a Classification Hearing to inform him of this designation," thus making it clear that the outcome of the "hearing" was predetermined.

10. In fact, the defendants did not bother even to have a show trial. Instead, taking a "let's-not-and-say-we-did" approach, they simply notified Mr. Reynolds later that day that "as a result of a hearing held on 3/24/21… you have been placed in the following restrictive status: High Security Effective 3/24/21."  (The signature of the DOC employee signing the notice is illegible.)

11.  "High Security" Status is one category of "Restrictive Status" described in Department of Correction Administrative Directive 9.4. A copy of the current provisions concerning High Security status is attached as Exhibit A to this Amended Complaint. It identifies the criteria for placement on High Security Status, which consist of a range of serious threats to the security of an institution - such things as hostage taking; assault on or murder of a staff member; history of serious disruptive behavior such as leading food strikes or work stoppages; a high escape profile; and present or past escapes. *See* Exhibit A.

12.  If Defendants purported to apply any of the authorized criteria for placement, it was 5c: "possession of escape related contraband (tools, civilian clothing, maps, etc.)."  But Mr. Reynolds did not possess any escape related contraband, a fact that would be immediately obvious to anyone who cared to take a moment to look - as the defendants might reasonably have been expected to do before placing on High Security an inmate who had just won a major ruling that among other things ordered them to remove him from Special Circumstances High Security.

13.  Mr. Reynolds promptly appealed the result of the "hearing" to Defendant Mulligan, explaining that he had not done anything that met the criteria for placement on High Security and had not gotten notice of any hearing. Mr. Reynolds added, pointedly but with the restraint that has characterized his behavior during his decades of incarceration:

> "I find this odd that just yesterday I was dropped from a level 5 after 26 years to a level 4 and now I'm being placed on High Security. I also find it odd that this is happening after a 2nd favorable ruling has me leaving N.C.I. to gen[eral] pop[ulation]."

14. Defendant Mulligan denied the appeal on April 13, stating inaccurately that Mr. Reynolds had entered "guilty pleas for escape related contraband" and adding without further explanation that he posed "a continuing threat to the safety and security of any correctional facility."

15. Mr. Reynolds had in fact pleaded guilty to other disciplinary breaches, but none was either escape-related or evidence of "a continuing threat to the safety and security of any correctional facility." These other breaches included possession of a pocket cigarette lighter - useful for repairing and connecting his authorized electronic equipment but not for escape - that was found in the March 15 shakedown involving seizure of the screwdriver; and possession of a sexually explicit DVD identified during further scrutiny of his possessions. During the March 15 shakedown the defendants also seized the over-the-counter pills that the institution provided Mr. Reynolds for lactose intolerance; he had in their view accumulated too many, a byproduct of his self-limiting his dairy intake. He also had previously pleaded guilty to making a phone call aiming, unsuccessfully, to obtain "gummy bears" containing THC. And in 2019 he had tested positive for THC when he was tested in connection with the investigation of another inmate's acquisition of marijuana.

16. Mr. Reynolds's High Security status was reviewed after a fashion on May 26, 2021. He was given a notice stating,

> A review will be conducted on [May 26] to determine your (*sic*) recommendation for removal or continued High Security status. At that time, you may present any documents or arguments to be included in your package to be forwarded to OCCPM ["Offender Classification and Population Management" - the second C appears to be a typo] for final decision. Have documents available during the review. Please make yourself available.

17. The review was described as to be done by Defendant Carbone and another Counselor Supervisor. However, Mr. Reynolds was only given the notice after whatever review there was had already taken place and both a recommendation to keep him on High Security and a "final decision" by Defendant Maiga to do so had been made without giving him a chance to appear or to submit anything.

18. Mr. Reynolds was next reviewed in November, this time by Defendant Carbone, in what was described as a "High Security review hearing." (A review of High Security status is required every six months, *see* Exhibit A at 12.) Although the Department of Corrections review form said that the "hearing was conducted with [Mr. Reynolds] to determine the status of his High Security placement," Mr. Reynolds did not learn of it until after the fact, and it apparently consisted at most of Defendant Carbone reviewing the prior "hearings." Defendant Carbone checked the box for "Continued placement on High Security Status." The "Reason why Inmate was placed on High Security" was described as "Possession of escape related tools" and "History of drug possession." As noted, Mr. Reynolds did not possess escape related tools and his drug possession, which was evidenced by one positive urine test years before (and, perhaps, the over-the-counter pills for lactose intolerance), is not a basis for placement on High Security status. *See* Exhibit A.

19. The recommendation was approved the same day by Defendants Barone and Doran.

20. Mr. Reynolds promptly appealed the decision. He pointed both to the absence of any opportunity to be heard at any hearing, or even to learn of a hearing's existence before the result was announced, and to the inconsistency of the result with the governing rule, Exhibit A, which he quoted in relevant part. When his request was returned to him because the appeal form had been changed in some (irrelevant) way, he recopied his appeal on the new form and submitted it January 31.

21. Defendant Barone denied the appeal – which, she should not have ruled on since it was from her own decision - three days later, February 3, without explanation other than a declaration that the rule requiring review every six months had been complied with.

22. In summary, from March 2021 to February 2022 Defendants assessed Mr. Reynolds's status as a High Security inmate no fewer than ten times: 3/19 Washington; 3/24 Maiga; 3/24 Bowles; 4/13 Mulligan; 5/26 Carbone; 5/?? (record unavailable) review by Defendant Maiga of 5/26 recommendation; 11/3 Carbone; 11/3 approval by Barone and Doran; and 2/3 Barone. Each time, the decision they made was patently inconsistent with the evidence and the relevant regulation, and it was made without: looking at the evidence; giving Mr. Reynolds a chance to be heard before the defendant or defendants reached – or, more precisely, jumped to - a conclusion; or, when he appealed, paying attention to his accurate and clearly-written summaries of the facts and the rules.

### The Consequences of Being on High Security

23. As the events concerning Mr. Reynolds's placement on High Security were unfolding, Defendants were also taking steps in response to the Second Circuit's decision, including arranging to transfer him to MacDougall-Walker C.I. Walker is used to assess inmates,

typically for 30 days, to determine what services and programs are appropriate for them; after that assessment, inmates are typically transferred to MacDougall.

24. At Northern Mr. Reynolds was assessed by staff in contemplation of his transfer. The assessment, called an Offender Accountability Plan, was prepared by a Correctional Counselor, apparently before Mr. Reynolds was put into High Security status (though it was executed by the Counselor and Mr. Reynolds on March 25, the next day following the designation).

25. The Plan identified four "program recommendations" for Mr. Reynolds: a "5 or 7 day job assignment"; a program called "VOICES"; participation in a "Lifers Group (40 years or more)"; and "Education needs to be identified." Mr. Reynolds would very much like to take advantage of these opportunities. Concerning "education needs," for example, he reads extensively, he writes well, and he thinks clearly; he has a GED, and he would be very capable of benefiting from and contributing to college level courses.

26. However, when Mr. Reynolds was transferred to Walker and then MacDougall, due to his High Security status he was able to participate only in some limited programming, including a wellness program on Monday and Wednesday, coping skills on Tuesday, a life program on Friday, and church on Saturday.

27. In fact, Mr. Reynolds was not even assessed at Walker, although the Inmate Handbook for MacDougall-Walker CI identifies Walker as an assessment center and the importance of assessment had previously been emphasized in 3:13cv1465. During the period that was supposed to be dedicated to a substantial orientation he was simply warehoused. After 30 days he was moved to MacDougall without the benefit of any assessment.

28. When he arrived at MacDougall in March 2021, Mr. Reynolds was denied the opportunity to take advantage of the full range of programs and activities that were made available to other inmates, including former death row inmates (presumably including Johnson and Santiago). To give one example, MacDougall has an "initial classification" process including: Orientation unit (N-pod) where program information is provided; Classification Unit (O-pod) where inmates are classified to one of four waiting lists (student/school, vocational, education, and work or kitchen); and Transition Unit (P-pod) for inmates in transition to other units of facilities or job classification. Mr. Reynolds was denied participation in that process.

29. Then, when Mr. Reynolds was transferred to Garner CI on February 28, 2022 (three days before the first status conference in this case), he was continued on High Security and remains on High Security today. As of the filing of this Amended Complaint, the reason for his transfer remains unknown to Mr. Reynolds. It happened without warning or explanation, and in fact the Warden at Garner expressed surprise to see him arrive. However, in the absence of any other plausible explanation it seems more probable than not that the transfer was either retaliatory or related to his retaliatory placement on High Security, or both.

30. At Garner, conditions more closely resemble those at Northern than those at MacDougall. Instead of a window worthy of the name, Mr. Reynolds's cell has the same kind of slot as the cells at Northern, offering the ability to see just a concrete wall, barbed wire, and at most a tiny slice of sky - even less than at Northern. The doors have traps, further isolating prisoners from staff. Because Mr. Reynolds is allowed to work only on his cell block, little work is available. The programs that were available at MacDougall

are not available, and there are no substitutes. There is no law library, an important source of activity and engagement with the wider world as well as a resource for development and prosecution of potential legal claims. His time out of cell is restricted to about three hours per day, plus 20 minutes for each meal. He cannot use the yard that other prisoners use but is confined to a smaller, less functional one.  His cell faces a concrete wall so that he cannot get radio reception and his TV reception is limited. As now described, conditions are in important ways worse than they were at Northern.

## **Deprivation of Personal Property**

31. When Mr. Reynolds was at Northern CI, the administration removed much of his personal property in 2010 in the wake of an incident in which inmate Daniel Webb struck an employee.  The property was returned piecemeal until, in 2013, some of it went missing, including family photos and legal documents as well as many commercially-purchasable items.  Northern CI officials at first claimed that Mr. Reynolds had possession of the missing property, but ultimately review of receipts confirmed that the property was in fact missing as Mr. Reynolds had said. On November 21, 2014, after much back-and-forth (mostly from Mr. Reynolds), Defendant Mulligan, then the Deputy Warden at Northern CI, told Mr. Reynolds to go ahead and order replacement items at his own (really, his family's) expense, including: a TV, boombox, alarm clock, T antenna, TV splitter, cables, adapters, Wahl hair clippers, Andis hair trimmer, JVC headphones, two pairs of Jordan sneakers, and others. After sending more than 70 reminders (he kept records and a timeline), Mr. Reynolds received some of the items in March 2016, more in May, and some more in December.

32. But when Mr. Reynolds was moved from Northern C.I. to MacDougall-Walker, much of that property was withheld from him, on the ground, as Defendant Barone described it to Mr. Reynolds, that it had not been purchased from the prison commissary. Mr. Reynolds made appropriate requests for the return of his property. He explained that the items had been specifically authorized by Defendant Mulligan and pointed out that other inmates had many items that were not available at the commissary, including some that were identical to items being withheld from him. Relevant documents are attached to the original Complaint in this case, at pp. 21-24 and 29-38.

33. Defendant Doran denied Mr. Reynolds's request, and then Defendant Barone reiterated that the only way he would be permitted to have items from anywhere other than the commissary was if he got a court order. However, as the affidavit of Jose Jusino attached as Exhibit B shows, items identical to those being withheld from Mr. Reynolds were allowed to Mr. Jusino without benefit of a court order. (Mr. Jusino asserts that when Defendant Doran learned that Mr. Jusino had told Mr. Reynolds about having the property, Doran warned him to "mind [his own] business [because his] property [isn't] part of any settlement and that they could take it away." *Id.*)

34. Then, when Mr. Reynolds was moved to Garner he had restored to him many of the items that had been withheld at MacDougall-Walker, but other items were still withheld from him for no good reason. One example is his TV, which is of the same type (a so-called "smart TV") as the TV in the Garner day room. He has been prohibited from having it because it could get a prohibited digital signal if it had internet access. But, like the dayroom TV, it doesn't have internet access, so the "smart" feature is irrelevant on both TVs, the one that is permitted and Mr. Reynolds's TV, which is prohibited.

35. Additionally, an item that was in storage at MacDougall, an Xbox, disappeared in transit to Garner. After searching Mr. Reynolds's cell for it, the Garner administration has now said that it has reappeared, for unexplained reasons. But they have not let him have it although it is harmless and provides Mr. Reynolds a way to pass the time, which he sorely needs so long as he is kept in the conditions the defendants are now imposing on him.

36. More generally, during the decades that Mr. Reynolds was held in the conditions that are the subject of 13cv1465, he was accompanied for the most part only by the objects and devices in his cell. Defendants' arbitrary withholding of those objects and devices deprives him of a very large part of the support he has used to remain for the most part mentally intact.

### INJURIES AND DAMAGES

37. As a result of Defendants' conduct, Mr. Reynolds is suffering a range of injuries. These include:

1. Emotional distress arising from:
    - Being deprived of the benefit of a hard-won legal victory that was and is extremely important to him;
    - being treated in a way that reasonably appears to be a gratuitous effort to subjugate him beyond what is necessary or appropriate;
    - being deprived of items and opportunities that are important for his mental and emotional stability;
    - being deprived of access to counseling and support services.
    - being subjected to conditions that are unnecessarily and inappropriately harsh;

- being deprived of any opportunity to be heard before being subjected to arbitrary and irrational punishment;

- being deprived of his rights to freedom of speech and to petition for redress of grievances and to due process of law, freedom from cruel and unusual punishment, and the equal protection of the laws.

2. Deprivation of his rights to freedom of speech and to petition for redress of grievances and to due process, freedom from cruel and unusual punishment, and equal protection of the laws; and to the benefit of this Court's order in 13cv1465.

3. Deprivation of the use of his property.

4. Deprivation of opportunities to engage in the range of activities available to sentenced prisoners, such as work, education, recreation, physical exercise, and social interaction.

5. Deprivation of access to legal materials that he might hope to use to better his circumstances.

## CLAIMS FOR RELIEF

### FIRST CLAIM - VIOLATION OF THIS COURT'S ORDERS IN 13cv1465

38. In 13cv1465 this Court issued orders for injunctive relief, affirmed by the Second Circuit: "(1) directing DOC to house Reynolds in conditions similar to those of Johnson and Santiago; and (2) requiring DOC to provide Reynolds with a meaningful individualized classification determination" [numbering of orders changed]. Defendants' conduct described above violated and continues to violate that order. Mr. Reynolds's conditions have been and are very different from those of Johnson or Santiago, and his placement on High Security for no good reason made his classification determination virtually meaningless.

**SECOND CLAIM - RETALIATION FOR EXERCISE OF FIRST AMENDMENT RIGHTS**

39. As described in the preceding paragraphs, Defendants have punished and retaliated against Mr. Reynolds for having exercised his rights under the First and Fourteenth Amendments to seek redress of his grievances, to due process of law, to equal protection of the laws, to freedom from being subjected to a bill of attainder, and to freedom from cruel and unusual punishment:

    a. He has, unlike Johnson and Santiago, been kept in a High Security status, with the attendant deprivations described in paragraphs 26-28 and 30-36

    b. he was not meaningfully classified at Walker or given work or education opportunities at MacDougall that on information and belief were afforded to Johnson and Santiago;

    a. he was not permitted to retain property other than that purchased at commissary, while on information and belief other prisoners at MacDougall-Walker, including Johnson and Santiago, were not so limited (although it is unknown whether Johnson or Santiago actually possessed any property);

    b. unlike Johnson and Santiago, he was transferred to Garner CI, where he is kept under the conditions, described in paragraphs 30 and 34-36 above, that are dissimilar to those in which Johnson and Santiago are held.

**THIRD CLAIM - DENIAL OF EQUAL PROTECTION**

40. Defendants' conduct described above is unreasonably harsher treatment of Mr. Reynolds than that imposed on other persons similarly situated, including other former death row prisoners and other incarcerated persons, in violation of the Equal Protection Clause of the Fourteenth Amendment.

## FOURTH CLAIM - DENIAL OF DUE PROCESS

41. Defendants' conduct described above has, without due process of law, deprived Mr. Reynolds of much of such liberty as he remains entitled to under the law, in violation of the Due Process Clause of the Fourteenth Amendment.

## FIFTH CLAIM - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER STATE LAW

42. Defendants' conduct described above has been extreme and outrageous, and Defendants knew or should have known that it has been highly likely to cause Mr. Reynolds severe emotional distress.

## SIXTH CLAIM – WANTON CONDUCT VIOLATING PLAINTIFF'S RIGHTS

43. Defendants' conduct described above was at least in substantial part a reckless and callous disregard of Mr. Reynolds's rights under the First and Fourteenth Amendments to seek redress of his grievances, to due process of law, to equal protection of the laws, to freedom from being subjected to a bill of attainder, and to freedom from cruel and unusual punishment, and to his rights pursuant to the orders of this Court and the Court of Appeals.

## RELIEF SOUGHT

Plaintiff claims the following relief:

1. An order directing Defendants to restore Mr. Reynolds to general population at MacDougall CI, with access to the programs and activities available to other inmates in general population, and with priority based on when he should have been placed on waiting lists (both in connection with his March 2021 transfer and, to simplify, taking into account when he should have been transferred in connection with 13cv1465) ;

2. Return to Mr. Reynolds of his property and replacement of any property that Defendants may have lost since the decision of the Court of Appeals in 13cv1465;

3. An order imposing appropriate sanctions on Defendants for violation of this Court's injunction in 13cv1465 as it was affirmed by the Court of Appeals. Such sanctions may include money damages, attorney's fees, and other relief within the discretion of the Court;

4. Compensatory and punitive damages, in amounts to be determined;

5. Attorney's fees and costs pursuant to 42 U.S.C. Section 1988.

6. Such other and further relief as may appear just to the Court.

THE PLAINTIFF

/s/ David N. Rosen
David N. Rosen
David Rosen & Associates, P.C.
400 Orange Street
New Haven, CT 06511
(203) 787-3513
(203) 789-1605 Fax
CT00196
drosen@davidrosenlaw.com