UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RICHARD REYNOLDS,
     Plaintiff,

     v.

ANGEL QUIROS, et al.,
     Defendants.

No. 3:21-cv-1064 (SRU)

<u>ORDER ON MOTION FOR SUMMARY JUDGMENT</u>

     Richard Reynolds, an incarcerated plaintiff, brings this action against nine Connecticut Department of Correction ("DOC") defendants alleging, *inter alia*, that the defendants retaliated against him after he prevailed in part in an earlier lawsuit that was appealed to the Second Circuit Court of Appeals. *See Reynolds v. Quiros*, 990 F.3d 286 (2d Cir. 2021) ("*Reynolds I*"). Reynolds brings a claim for contempt of court; Section 1983 claims for unlawful retaliation, violation of his equal protection rights, and violation of his due process rights; and state law claims for intentional infliction of emotional distress and wanton conduct violating the plaintiff's rights. *See* Doc. No. 31. The defendants have filed a motion for summary judgment seeking to dismiss all of Reynolds's claims. *See* Doc. No. 122. For the reasons set forth below, the defendants' motion for summary judgment is **granted**.

I.     **Standard of Review**

     Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986). When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable

inferences against the moving party. *Anderson*, 477 U.S. at 255; *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325-27 (1986).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

> The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247-48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

## II.    Background

### A.    Procedural History

In 1992, Reynolds was convicted of murdering a police officer. *See State v. Reynolds*, 264 Conn. 1, 23 (2003). He was subsequently sentenced to death. *Id.* at 24. After Connecticut abolished the death penalty retroactively, Reynolds was resentenced in 2017 to life in prison

without the possibility of release. *See Reynolds v. Arnone*, 402 F. Supp. 3d 3, 13 (D. Conn. 2019). After that resentencing, Reynolds was classified as a Special Circumstances inmate pursuant to Connecticut General Statute Section 18-10b ("Section 18-10b"). Conn. Gen. Stat. § 18-10b. That classification corresponded with significant restrictions to Reynolds's confinement conditions.

In 2013, Reynolds filed a complaint in this Court challenging his conditions of confinement. *See Reynolds v. Arnone*, Dkt. No. 13-cv-1465, Doc. No. 1. After he was resentenced, Reynolds filed a second amended complaint, in which he brought multiple claims, including an argument that Section 18-10b was an unconstitutional bill of attainder, as well as challenging his conditions of confinement. *Reynolds v. Arnone*, Dkt. No. 13-cv-1465, Doc. No. 71-1. On August 27, 2019, I granted Reynolds's motion for summary judgment and denied the defendants' motion for summary judgment, holding, *inter alia*, that Section 18-10b is an unconstitutional bill of attainder, and that Reynolds's constitutional right to equal protection had been violated. *Reynolds v. Arnone*, 402 F. Supp. 3d 3. I subsequently issued a permanent injunction enjoining the defendants. *Reynolds v. Arnone*, Dkt. No. 13-cv-1465, Doc. No. 156. The defendants appealed my order. *See Reynolds v. Arnone*, Dkt. No. 13-cv-1465, Doc. No. 160. On March 11, 2021, the Second Circuit issued a ruling affirming in part and vacating in part my order. *Reynolds I*, 990 F.3d 286. Specifically, the Second Circuit vacated my ruling regarding Reynolds's conditions of confinement and due process claims, and the Second Circuit affirmed my ruling that Section 18-10b was an unconstitutional bill of attainder and that Reynolds's equal protection rights had been violated. *Id.* at 302. The Second Circuit also affirmed in part my permanent injunction. *Id.*

Reynolds filed his complaint in the instant action on August 3, 2021, in which he alleged that the defendants retaliated against him in response to my and the Second Circuit's rulings, by, *inter alia*, depriving him of his property. *See generally* Doc. No. 1. Reynolds filed an amended complaint on April 6, 2022, bringing claims for contempt, retaliation, denial of equal protection, denial of due process, intentional infliction of emotional distress, and wanton conduct violating the plaintiff's rights. Doc. No. 31. The defendants filed a motion for summary judgment on August 25, 2023, seeking to dismiss all of Reynolds's claims. Doc. No. 122.

B. <u>The Defendants</u>

The defendants in this action are:

- Angel Quiros, DOC commissioner since 2020, Doc. No. 123-1 at ¶ 2;

- Kristine Barone, warden at MacDougall-Walker Correctional Institution ("MacDougall-Walker") from 2019 until 2022, Doc. No. 123-2 at ¶ 3;

- Scott Salius, shift commander at the Walker building of MacDougall-Walker in March 2021, Doc. No. 123-8 at ¶ 4;

- William Mulligan, DOC deputy commissioner since 2020, Doc. No. 123-3 at ¶ 3;

- David Maiga, 2021 director of the DOC's Offender Classification and Population Management, Doc. No. 123-7 at ¶ 3;

- Craig Washington, 2021 deputy warden at Northern Correctional Institution ("Northern"), acting warden at Northern in March 2021, and warden at Garner Correctional Institution ("Garner") after Northern's closure, Doc. No. 123-4 at ¶¶ 3-4;

- Roger Bowles, warden at Northern from 2019 until 2021, Doc. No. 123-6 at ¶ 3;

- Damien Doran, deputy warden at MacDougall-Walker from March 2021 until February 2022, Doc. No. 123-5 at ¶ 3; and

- Joshua Burns, property officer for the MacDougall building of MacDougall-Walker in March 2021, Doc. No. 123-9 at ¶ 3.

C. <u>Reynolds's 2021 Phone Calls</u>

In February 2021, Reynolds was incarcerated at Northern. *See* Doc. No. 128 at ¶ 15. On February 26, 2021, DOC officer Ortiz was "monitoring random phone calls in accordance with Administrative Directive 10.7" when he came upon a phone call placed by Reynolds on February 24, 2021. Def.'s Ex. K-1, Doc. No. 125 at 7. Reynolds had placed that phone call to his sister Jacqueline. Doc. No. 128 at ¶ 16; Def.'s Ex. K-1, Doc. No. 125 at 7. During the call, Reynolds asked to speak with his nephew James to ask about a hard drive. Doc. No. 128 at ¶ 18; Def.'s Ex. K-1, Doc. No. 125 at 7. Jacqueline stated that she wanted to make sure that whatever James was mailing Reynolds "[didn't] go in [James's] name" because she did not want "any problems." Doc. No. 128 at ¶ 19; Def.'s Ex. K-1, Doc. No. 125 at 7. Reynolds then spoke to James, who told him he had gotten Reynolds what he needed, but not "all 12 of the bars"—only ten bars and one "gummy." Def.'s Ex. K-1, Doc. No. 125 at 8. Near the conclusion of the call, Reynolds referenced an individual named "21" and mentioned that Reynolds might have to pay another $50 for the items. *Id*.

After hearing that February 24, 2021 conversation, Officer Ortiz decided to review other phone calls by Reynolds. *See* Doc. No. 128 at ¶ 20; Def.'s Ex. S, Doc. No. 126 at 36; Def.'s Ex. K-1, Doc. No. 125 at 9.

1.  *February 3, 2021 Phone Call*

Reynolds made a call to James on February 3, 2021. Def.'s Ex. K-1, Doc. No. 125 at 15. Ortiz reviewed the call on March 11, 2021. *Id*.

In that call, Reynolds spoke with his nephew James and appeared to discuss obtaining edible marijuana as candy bars. Doc. No. 128 at ¶ 23. James told Reynolds he could get Reynolds "some bars" including flavors and brands of candy, as well as "containers with marshmallows." Def.'s Ex. K-1, Doc. No. 125 at 15. However, James told him that the candy bars would have "tags and stuff." *Id*. Reynolds asked for the price. *Id.* Another individual, Jalen, interrupted the call to say, "[t]here's stuff all over it [that] literally identifies it has weed." *Id*. James then suggested coloring the labels with black marker. *Id*. Reynolds again asked for the prices, appeared to do some mathematical calculations, then requested "12 of them" for "a little under $400." *Id*. Reynolds stated that he sent money to Reynolds's son, Paul, and that he will have him "funnel the money to [James]." *Id*. at 16.

2.  *February 17, 2021 Phone Call*

Reynolds placed a call on February 17, 2021 to Jacqueline. Def.'s Ex. K-1, Doc. No. 125 at 9. Ortiz reviewed the call on March 2, 2021. *Id.*

In that call, Reynolds told Jacqueline to tell James to get the items together to send to Reynolds because the inmates were going to be transferred out of Northern by July 1. *Id*. Reynolds explained that he needed everything now "because wherever [he's] going is a whole new thing now, different people running the show." *Id*.

3.  *February 22, 2021 Phone Call*

On February 22, 2021, Reynolds called Jacqueline's number. Def.'s Ex. K-1, Doc. No. 125 at 9. Ortiz reviewed the call on March 2, 2021. *Id*.

6

A person presumed to be James answered the call. *Id*. Reynolds inquired whether there was any word from James's "cousin" regarding the "hard drive." *Id*. Reynolds informed James that the hard drive will have a vent with a switch on the bottom that can be pushed forward. *Id*.

### 4. *February 24, 2021 Phone Call*

Reynolds's February 24, 2021 call is the call that prompted Ortiz to conduct a more thorough review of Reynolds's other calls. Ortiz reviewed that February 24 call on February 26, 2021. *See* Def.'s Ex. K-1, Doc. No. 125 at 7. The contents of that call are summarized above.

### 5. *March 2, 2021 Phone Call*

On March 2, 2021, Reynolds called a number unknown to DOC investigators, but they believe that number belonged to James. Def.'s Ex. K-1, Doc. No. 125 at 11. Ortiz reviewed that call on March 4, 2021. *Id.*

In that call, Reynolds told James that a "Debbie" had told Reynolds that she tried to call James over the weekend. *Id.* James responded in the affirmative, stating that he plans to call her back. *Id*. Reynolds reminded James that he needs to send money and the hard drive. *Id*.

### 6. *March 4, 2021 Phone Calls*

On March 4, 2021, Reynolds called a number believed to belong to Paul, Reynolds's son. *Id*. at 12. Ortiz reviewed that call on March 5, 2021. *Id*. In that call, Reynolds referenced the "stuff from James" and instructed Paul to send the package using Paul's old address. *Id*.

Reynolds made another call on March 4 to Jacqueline, and that call was also reviewed by Ortiz on March 5, 2021. *Id*. During that call, James joined the call and began speaking to Reynolds. *Id.* James told Reynolds that he had been attempting to call Debbie and has not been able to get ahold of her. *Id*. Reynolds told him to call Debbie again, that it is only the "money

that's going to be going," and that the hard drive is going with Paul "with the um flowers and the text." *Id*. at 13. James was later heard in the background apparently on the phone with Debbie. *See id*.

### 7. *March 6, 2021 Phone Call*

On March 6, 2021, Reynolds called Jacqueline and asked her where James was. *Id*. at 14. The call was reviewed by Ortiz on March 9, 2021. *Id*. Reynolds then spoke to James and asked him whether he had given Debbie money. *Id*. Reynolds told him that instead of giving Debbie $200 he should have given her $250. *Id*. Reynolds then told James that, that week, he should take care of "the rest of that" with James's cousin. *Id*.

### D. DOC Discipline of Reynolds and High Security Classification Decision

The Second Circuit decision in *Reynolds I* was issued on March 11, 2021. On March 15, 2021, the DOC began taking steps to discipline Reynolds for the contents of the phone calls, as well as for other infractions discovered in connection with the investigation into the phone calls.

### 1. *Searches and Disciplinary Reports*

Early on the morning of March 15, 2021, Reynolds was placed in restraints and taken to the medical unit, where he was strip searched. *See* Def.'s Ex. K-1, Doc. No. 125 at 17-20. Also on the morning of March 15, 2021, Reynolds was issued a Class A disciplinary report for conspiracy to convey contraband. Def.'s Ex. W, Doc. No. 123-33 at 1; Def.'s Ex. S, Doc. No. 126 at 79. Reynolds pled guilty to the disciplinary report on March 15, 2021. *See* Def.'s Ex. S, Doc. No. 126 at 80.

Additionally, on March 15, 2021, DOC officers removed and searched Reynolds's property. Def.'s Ex. K-1, Doc. No. 125 at 22. Ortiz was one of the officers conducting the

search. During the search of the property, Ortiz found a piece of paper that included names and

numbers, one of which was the name "721." *Id*. The paper with the phone numbers was found in

a bundle with other papers. *Id.* A few hours later, while continuing the search, Ortiz found

another piece of paper in Reynolds's property bearing nearly identical phone numbers. *Id*. The

next day, Ortiz found a pocket calendar that had writing on February 18 stating "721 wants

$50.00." *Id.* at 24.

Another officer, Eshou, was also searching Reynolds's property on March 15, 2021. *Id*. at

23. He found a concealed lighter and a white box containing a screwdriver. *Id*. Reynolds was

issued a Class A contraband disciplinary report for both the lighter and the screwdriver. *Id*.; *see

also* Def.'s Ex. V, Doc. No. 123-32 at 1. Reynolds pled guilty to that disciplinary charge on

March 16, 2021. Def.'s Ex. S, Doc. No. 126 at 83.

Officers continued searching Reynolds's property for a number of days. On March 17,

2021, Reynolds's black external hard drive was confiscated as contraband without the issuance

of a misconduct report. Def.'s Ex. X, Doc. No. 123-34 at 1; Def.'s Ex. S, Doc. No. 126 at 109.

On March 17, 2021, Ortiz found a brown bag with "an excessive amount of medication" among

Reynolds's property. Def.'s Ex. Y, Doc. No. 123-35 at 1. Reynolds was issued a Class B

disciplinary report on March 18, 2021 for the medications. *Id*. Also on March 18, 2021, officers

searching Reynolds's property found an unauthorized pornographic video. Def.'s Ex. Z, Doc.

No. 123-36 at 1. Reynolds was issued a Class A contraband disciplinary report for the video. *Id*.

2.  *Modifications to Reynolds's Status*

The DOC issued a Restrictive Housing Unit Status Order to Reynolds on March 15,

2021, placing him on administrative detention because he conspired to convey contraband into

the prison. Def.'s Ex. K-1, Doc. No. 125 at 44. Reynolds received a copy of the form on March

17, 2021 at 1:00 pm. *Id*.

On March 19, 2021, Washington, acting warden of Northern, sent a memorandum to

Maiga, director of Offender Classification and Population Management, regarding Reynolds's

status. Def.'s Ex. AA, Doc. No. 123-37 at 3. In that memorandum, Washington recommended

that Reynolds be placed on High Security status. *Id*. The memorandum discussed Reynolds's

recent disciplinary reports; the time he tested positive in 2019 for THC; and the fact that

Reynolds has been confined at Northern since 1995 and is about to be transferred. *Id.* On March

24, 2021, Maiga sent a letter to Bowles, warden of Northern, concurring with "[his]

recommendation" regarding Reynolds's placement on High Security status. *Id*. at 2. The letter

instructed Bowles to "hold a Classification Hearing" to inform Reynolds of his new status. *Id.*

On March 24, 2021, Reynolds was placed on High Security status as a result of a "hearing" held

that same day. *Id.* at 1.

On March 25, 2021, Reynolds was transferred from Northern to MacDougall-Walker.

Def.'s Ex. EE, Doc. No. 123-41 at 1. The DOC conducted reviews of Reynolds's High Security

Status on May 26, 2021, November 30, 2021, and May 24, 2022. Doc. No. 128 at ¶ 59. On

February 28, 2022, Reynolds was transferred to Garner. Def.'s Ex. EE, Doc. No. 123-41 at 1. On

June 6, 2022, Reynolds was removed from High Security status. Doc. No. 128 at ¶ 60.

E.  <u>Investigation into Silva</u>

On March 16, 2021, DOC Officer Ortiz reviewed calls made by Silva, another inmate.

Def.'s Ex. K-1, Doc. No. 125 at 21. He found a call made by Silva on March 15, 2021, in which

Silva called his mother's number and asked for the number of Paul—presumably Reynolds's

son, Paul. *Id*. Silva's mother gave Silva the number. *Id*. In English and Spanish, Silva told his

mother to text Paul and tell him not to send the "other stuff from cousin" but to "still send the control." *Id*.

On March 16, 2021, Silva was placed on Administrative Detention pending the adjudication of a Class A contraband disciplinary report. *Id*. at 45. In the disciplinary report, Ortiz wrote that "Silva had an active role in [the] conspiracy to convey contraband based on information obtained from" the March 15 phone call. *Id*. at 50. Silva pled guilty to the disciplinary charge on March 17, 2021. *Id*. at 51.

### III.   Discussion

The defendants move for summary judgment on all of Reynolds's claims. For the reasons articulated below, that motion is granted.

### A.   Reynolds's Responses to the Defendants' Local Rule 56(a)1 Statement of Facts

For some of the defendants' statements of fact, Reynolds's counsel states that "no response is warranted" because the exhibits were filed under seal for attorneys' eyes only and not shared with Reynolds. *See* Doc. No. 128; *see also* Doc. No. 102 (protective order concerning documents related to DOC investigations into staff misconduct). By way of explanation, Reynolds's counsel states that he "did not see how to confirm with Mr. Reynolds the veracity of material that has been provided under seal for attorney's eyes only." Doc. No. 149 at 1. Further, Reynolds's counsel contends that "[t]he suggestion . . . that Mr. Reynolds could rely on his own recollection to confirm the quite detailed description of telephone conversations from early in 2021 not only seems, and seemed, unrealistic but also would necessarily require disclosure to Mr. Reynolds of the contents of the conversations." *Id*. at 1-2.

Pursuant to the Local Rules, "[e]ach material fact set forth in [a moving party's] Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted unless such fact

is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party." D. Conn. L. Civ. R. 56(a)1. In *Johnson*, where the plaintiff had "not denied many of the statements in the Defendants' 56(a)1 statement, admitting instead that she [was] unable to admit or deny them for various reasons," the court held that "where the Plaintiff has neither admitted nor denied a fact and where the record supports such fact, those facts are deemed to be admitted." *Johnson v. Connecticut Dep't of Admin. Servs.*, 972 F. Supp. 2d 223, 229 (D. Conn. 2013), *aff'd*, 588 F. App'x 71 (2d Cir. 2015). Furthermore, courts in this circuit have held that a party's "failure to recall" facts "is insufficient to create a genuine dispute of material fact." *Maioriello v. New York State Off. for People With Developmental Disabilities*, 272 F. Supp. 3d 307, 334 (N.D.N.Y. 2017) (collecting cases).

Information regarding phone calls Reynolds himself conducted is information of which he has personal knowledge. Moreover, although Reynolds could not view the underlying exhibits, he had the ability to view the defendants' statements of fact in the unsealed motion for summary judgment. *See* Doc. No. 122-2. Reynolds therefore was under an obligation under the Local Rules to supply a response to the defendants' statements of fact, even if his responses would have stated that he did not remember certain details of the phone calls. Accordingly, I deem facts to which Reynolds had personal knowledge and did not respond to be admitted.

B. Contempt

The defendants argue that Reynolds cannot state a claim for civil contempt in an independent action. *See* Doc. No. 122-1 at 15. They further contend that because all the defendants in this case, except Quiros, were not defendants in *Reynolds I*, they are not bound by this Court's permanent injunction in *Reynolds I*. *Id*.

The defendants here make an argument "directed at the legal sufficiency" of Reynolds's contempt claim, "and not at the factual basis for the claim." *Leary v. Manstan*, 2015 WL 521497, at *5 (D. Conn. Feb. 9, 2015). In such a circumstance, courts have held that "it is appropriate to assess the motion under a Rule 12(b)(6) standard." *Id*. (collecting cases). If a court intends to "base[] its decision to dismiss solely on the pleadings," it "may convert a motion for summary judgment into a Fed. R. Civ. P. 12(b)(6) motion to dismiss a complaint for failure to state a claim without notice to either party." *Scafe v. Pataki*, 2009 WL 2707317, at *6 (E.D.N.Y. Aug. 26, 2009) (citing *Katz v. Molic*, 128 F.R.D. 35, 37-38 (S.D.N.Y.1989)); *see also Risco v. McHugh*, 868 F. Supp. 2d 75, 106 n.45 (S.D.N.Y. 2012) ("The Second Circuit has recognized that, '[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment.'") (quoting *Schwartz v. Compagnie Gen. Transatlantique*, 405 F.2d 270, 273 (2d Cir. 1968)). Accordingly, because the defendants argue that Reynolds's contempt claim is not cognizable, I will evaluate the defendants' argument under the Rule 12(b)(6) standard. To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

As a preliminary matter, the defendants are incorrect that only the defendants in *Reynolds I* are bound by this Court's permanent injunction in *Reynolds I*. In my permanent injunction order in *Reynolds I*, I "ordered that the Defendants, their successors in office, agents, servants, employees, and attorneys and those in active concert and participation with any of the foregoing who receive actual notice of this Order" to be permanently enjoined. *Reynolds I*, Dkt. No. 3:13-cv-01465-SRU, Doc. No. 156 (Permanent Injunction Order). Because all DOC defendants in the instant case fall under that category, all are bound by my injunction in *Reynolds I*.

Notwithstanding the defendants' obligation to abide by my injunction, Reynolds cannot bring a cognizable civil contempt claim as an independent cause of action. Courts have dismissed civil contempt claims where plaintiffs attempted to bring those claims in independent actions—as opposed to through a contempt *motion* brought in the same action in which the injunction was issued. *See Johnson v. City of New York*, 2018 WL 1597393, at *24 (E.D.N.Y. Mar. 31, 2018) ("[B]ecause civil contempt is a 'part of the action that is the source of the order that is the subject of noncompliance,' it cannot be a separate, stand-alone 'cause of action.'") (internal citation omitted); *Sec. & Exch. Comm'n v. McGinn*, 2010 WL 11469813, at *4 (N.D.N.Y. Dec. 1, 2010) ("[P]roceeding by motion in seeking an order of civil contempt rather than commencing a separate proceeding constitutes the general practice in federal courts.") (collecting cases); *see also* Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure. § 1017 (4th ed. 2023) ("Civil contempt proceedings are considered to be a part of the action that is the source of the order that is the subject of the noncompliance. Thus, when the original action was governed by the Federal Rules of Civil Procedure, the contempt proceeding designed to enforce the court's order will be as well.").

Furthermore, at the hearing on the motion for summary judgment, the plaintiff appeared to concede that the contempt claim should have been brought under *Reynolds I*. Doc. No. 151 at 4. Accordingly, Reynolds's civil contempt claim is dismissed pursuant to Rule 12(b)(6) as not cognizable in this action. *See* Fed. R. Civ. P. 12.

C. Retaliation

The defendants further move for summary judgment on Reynolds's retaliation claim. The three elements of a First Amendment retaliation claim are "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there

was a causal connection between the protected speech and the adverse action." *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)).

### 1. *Whether Speech or Conduct Was Protected*

The defendants do not dispute that Reynolds has met the first element of his retaliation claim. The filing of a lawsuit is clearly a protected act. *See Colombo v. O'Connell*, 310 F.3d 115, 118 (2d Cir. 2002) ("[T]he right of a private individual to sue and defend in the courts is protected by the First Amendment because it is the right conservative of all other rights [which] lies at the foundation of orderly government") (cleaned up); *see also Espinal*, 558 F.3d at 128-29 ("There is no dispute that [plaintiff's] earlier federal lawsuit, filed in June 1998 and dismissed in June 1999, was a protected activity."). Accordingly, Reynolds has established the first element of a First Amendment retaliation claim.

### 2. *Whether the Defendants Took Adverse Action Against Reynolds*

Reynolds alleges four adverse actions taken in retaliation for his protected conduct: his placement on High Security status and being kept on that status; his denial of programming opportunities; his deprivation of his property; and his transfer from MacDougall-Walker to Garner. Doc. No. 127-1 at 45. The defendants argue that Reynolds's transfer to Garner is not an "adverse action." Doc. No. 122-1 at 17.

An "adverse action" is "retaliatory conduct . . . that would deter 'a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Zielinski v. Annucci*, 547 F. Supp. 3d 227, 233 (N.D.N.Y. 2021) (quoting *Hayes v. Dahlke*, 976 F.3d 259, 272 (2d Cir. 2020). The Second Circuit has instructed courts to "properly approach prisoner retaliation claims 'with skepticism and particular care,' because 'virtually any adverse action

15

taken against a prisoner by a prison official—even those otherwise not rising to the level of a

constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'"

*Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 491

(2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506

(2002)). "[O]nly retaliatory conduct that would deter a similarly situated individual of ordinary

firmness from exercising his or her constitutional rights constitutes an adverse action" for First

Amendment purposes. *Wrobel v. County of Erie*, 692 F.3d 22, 31 (2d Cir. 2012) (citation

omitted). Although the standard is well-settled, the inquiry into whether an action meets that

standard is context-specific and "must be 'tailored to the different circumstances in which

retaliation claims arise.'" *Dawes*, 239 F.3d at 493 (citation omitted). Because the inquiry is

objective, the focus is not whether a particular individual *was* in fact deterred from engaging in

further protected conduct, but instead whether a reasonable person would have been. *See*

*Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) ("[A] prisoner 'should not be denied remedy

because his extraordinary efforts resulted in the resolution of grievances that would have

deterred a similarly situated individual of ordinary firmness.'").

     Here, the defendants argue that Reynolds's transfer from MacDougall-Walker to Garner

cannot be an adverse action because it did not entail transferring him to "more onerous"

conditions. Doc. No. 122-1 at 20. Indeed, retaliatory transfer cases often involve not only a

transfer but also the imposition of more restrictive conditions. *See, e.g.*, *Burns v. Martuscello*,

890 F.3d 77, 93 (2d Cir. 2018) (placement in Involuntary Protective Custody, which

"significantly impair[ed] [plaintiff's] ability to move within the facility, socialize, and engage

with prison programming" constituted adverse action); *Meriwether v. Coughlin*, 879 F.2d 1037,

1040 (2d Cir. 1989) (retaliatory transfer "to other maximum security facilities," where upon

16

arrival inmates "were beaten" by "correctional officials wielding batons" constituted adverse

action); *Green v. Martin*, 224 F. Supp. 3d 154, 175 (D. Conn. 2016) (unit transfer was not

adverse action, even though new unit did "not offer a number of programs that [the plaintiff]

requires and that other inmates are offered," because the plaintiff had not set forth allegations

how the adverse effects were unique to the new unit); *Davis v. Kelly*, 160 F.3d 917, 919-20 (2d

Cir. 1998) (transfer to maximum security facility that was a "'disciplinary problem prison,'

plagued by violence and unsuited to rehabilitation," constituted adverse action).

Some courts have held, however, that a transfer in and of itself is sufficient to constitute

an adverse action. *See Smith v. Levine*, 510 F. App'x 17, 21 (2d Cir. 2013) (holding that the

argument that a transfer was not an adverse action because "the conditions at [the new facility]

were not appreciably worse than at [the original facility]" is a "claim [that] finds no support in

the relevant case law"); *Townsend v. Castillo*, 2021 WL 3409326, at *6 (D. Conn. Aug. 4, 2021)

(stating generally that "transfer of a prisoner to another prison facility—even to another prison

facility with comparable conditions—could rise to the level of an adverse action" but ultimately

holding that a "transfer[] from an open-compound facility with dormitory housing to a Level 4

facility with considerably harsher conditions of confinement" constituted an adverse action.").

Here, whether Reynolds's transfer to Garner constituted an adverse action appears to be a

question that turns on facts, and not law. *See Bryant*, 923 F.2d at 982. The defendants have

submitted evidence suggesting that the transfer was not an adverse action. *See, e.g.*, Def.'s Ex. J,

Doc. No. 123-10 at ¶ 12 (stating that Reynolds expressed a desire to leave MacDougall-Walker).

Reynolds, in response, has supplied testimony suggesting that the transfer to Garner subjected

him to less advantageous conditions. *See* P.'s Ex. 2, Doc. No. 129-1 at ¶ 8.[1] Accordingly, the question whether the transfer to Garner was an adverse action is a triable issue of fact.

### 3.   *Causation*

The third element in a retaliation claim is that the protected conduct must have been "'a substantial or motivating factor in the prison officials' decision to' take the alleged adverse action." *Hamilton v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 2021 U.S. Dist. LEXIS 156205, at *93 (N.D.N.Y. Aug. 17, 2021) (quoting *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002)). A plaintiff alleging a retaliation claim bears the initial "burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." *Gayle*, 313 F.3d at 682 (quoting *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)).

I will begin by considering the timeline of the investigation into Reynolds's phone calls and subsequent disciplinary measures. The investigation into Reynolds began before the Second Circuit issued its decision in *Reynolds I*:

- **February 26, 2021**: Reynolds is housed at Northern. DOC Officer Ortiz is conducting randomized phone call surveillance when he happens upon a phone call in which Reynolds appears to speak about smuggling contraband into the correctional facility. Ortiz begins looking into other calls made by Reynolds. *See* Def.'s Ex. K-1, Doc. No. 125 at 7-9.

---

[1] The defendants cite *Green* to contend that Reynolds improperly complains solely "about Garner as a facility rather than the effects of the transfer." Doc. No. 122-1 at 20. In *Green*, however, the plaintiff had moved from one type of unit to another type of unit within the same facility, and the plaintiff had only alleged unfavorable facts about the conditions that applied to the broader facility and not facts unique to the new unit to which he was transferred. *Green*, 224 F. Supp. 3d at 174-75. By contrast, here, Reynolds has submitted testimony regarding the services and programs specific to Garner. *See, e.g.*, P.'s Ex. 2, Doc. No. 129-1 at ¶ 8.

- **February 26 – March 11, 2021**: DOC officers listen in on phone calls made by Reynolds in February and March of 2021 that indicate, *inter alia*, an intent to smuggle marijuana into the prison. In one call by Reynolds on February 17, 2021, Reynolds mentions that inmates were going to be transferred out of Northern by July 1, 2021. *See id.* at 7-16.

- **March 11, 2021**: The Second Circuit issues its decision in *Reynolds I.*

- **March 15, 2021**: DOC officers strip search Reynolds; Reynolds is issued a Class A disciplinary report for conspiracy to convey contraband; he pleads guilty to that disciplinary report; his property is taken by DOC officers and searched; one officer finds two pieces of paper on which "721" and phone numbers are written; another officer finds a concealed lighter and a white box containing a screwdriver; and Reynolds is issued a Class A contraband disciplinary report for the lighter and the screwdriver. Reynolds is placed in Administrative Detention. *See* Def.'s Ex. K-1, Doc. No. 125 at 17-20, 22-24, 44; Def.'s Ex. W, Doc. No. 123-33 at 1; Def.'s Ex. S, Doc. No. 126 at 79.

- **March 16, 2021**: Reynolds pleads guilty to the disciplinary report regarding the lighter and screwdriver. Def.'s Ex. S, Doc. No. 126 at 80.

- **March 17, 2021:** DOC officers confiscate Reynolds's hard drive. Def.'s Ex. X, Doc. No. 123-34 at 1; Def.'s Ex. S, Doc. No. 126 at 109. An officer searching Reynolds's property finds an excessive amount of medication. Def.'s Ex. Y, Doc. No. 123-35 at 1.

- **March 18, 2021**: Reynolds is issued a Class B disciplinary report for the medications. Def.'s Ex. Y, Doc. No. 123-35 at 1. Officers searching Reynolds's

property find an unauthorized pornographic video, and Reynolds is issued a Class
A contraband disciplinary report for the video. Def.'s Ex. Z, Doc. No. 123-36 at
1.

- **March 19, 2021**: Washington sends a memorandum to Maiga recommending that
  Reynolds be placed on High Security status. Def.'s Ex. AA, Doc. No. 123-37 at 3.

- **March 24, 2021**: Maiga sends a letter to Bowles agreeing to place Reynolds on
  High Security status and instructing Bowles to "hold a Classification Hearing" to
  inform Reynolds of his new status. *Id.* at 2. Reynolds is placed on High Security
  status. *Id.* at 1.

- **March 25, 2021**: Reynolds is transferred from Northern to MacDougall-Walker.
  Def.'s Ex. EE, Doc. No. 123-41 at 1.

- **February 28, 2022**: Reynolds is transferred from MacDougall-Walker to Garner.
  *Id.*

In their motion for summary judgment, the defendants do not contest that there is a
temporal proximity between the Second Circuit decision in *Reynolds I* and the adverse actions at
issue here. However, the defendants contend that Reynolds has not provided any non-conclusory
evidence of retaliatory animus other than the temporal proximity of the Second Circuit decision.
*See* Doc. No. 122-1 at 17. The defendants rely on *Parks v. Blanchette*, which provides that
"[p]risoner plaintiffs may rely on circumstantial evidence to prove their retaliation claims, such
as temporal proximity of events, but in doing so, the plaintiff also must usually provide some
non-conclusory evidence that raises an inference of 'retaliatory animus' in order to proceed to
trial." *Parks v. Blanchette*, 144 F. Supp. 3d 282, 331 (D. Conn. 2015). Other courts in this
circuit, however, have held temporal proximity to be sufficient in some cases. In *Espinal*, the

Second Circuit held that "[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." 558 F.3d at 129; *see also id*. (holding that "the passage of only six months between the dismissal of Espinal's lawsuit and an allegedly retaliatory beating by officers . . . is sufficient to support an inference of a causal connection"); *Barrington v. New York*, 806 F. Supp. 2d 730, 750 (S.D.N.Y. 2011) (holding that "an inference that [the defendant] knew about the lawsuits, together with the facts that the other defendants had been served in this action the same day and a judgment had been entered against the State for their conduct just weeks before the August 7, 2008 incident, establishes a genuine issue of material fact as to whether [the defendant's] alleged assault was in retaliation"). *But see Colon v. Coughlin*, 58 F.3d 865, 872-73 (2d Cir. 1995) (stating that "we might be inclined to affirm the grant of summary judgment based on the weakness of Colon's case" had "circumstantial evidence" regarding temporal proximity and prior good behavior "represented the sum total of Colon's proof," but Colon "also presents direct evidence of retaliation" that defeats the motion for summary judgment); *Faulk v. Fisher*, 545 F. App'x 56, 59 (2d Cir. 2013) (evidence of "'excellent' disciplinary history prior to his successful grievance, and the two misbehavior reports issued by corrections officers . . . the day after Faulk succeeded on his grievance" were insufficient to establish causation).

Reynolds has supplied more by way of facts than simple temporal proximity to support his claim of retaliation. For example, Reynolds supplies evidence supporting the inference that the defendants had knowledge of the Second Circuit decision in *Reynolds I* after it was issued. Reynolds's testimony is specific—he cites to other inmates and names multiple correctional officers who spoke to him about the outcome of the Second Circuit decision. *See* Def.'s Ex. T, Doc. No. 125-30 at 77-79. Reynolds also testifies to a conversation between himself and

Mulligan in which Reynolds told Mulligan about his placement on High Security status and the confiscation of his property right after the Second Circuit decision in *Reynolds I*. *See id.* at 87-88. Reynolds avers he further told Mulligan that he has been filing grievances, and Mulligan responded with something to the effect of, "[y]ou know what you need to do." *See id*. In addition, Reynolds submits evidence showing that very few inmates are placed on High Security status for possession of contraband, and no inmates were placed on High Security status since 2021 for mere conspiracy to convey contraband. *See* P.'s Ex. 3, Doc. No. 129-2; P.'s Ex. 7, Doc. No. 129-6. Facts on the record also show that certain aspects of the conditions of High Security status were similar to those imposed by Section 18-10b. *See* P.'s Ex. 6, Doc. No. 129-5 at 21-24. Furthermore, facts on the record show that DOC officials believed that because Reynolds had been housed at Northern since 1995, supervision of him should increase when he is transferred out of Northern. *See id*. at 85-86. That reasoning could support multiple inferences about the defendants' intent—including that they had reasonable penological concerns about the transition, as well as that they intended to retaliate against Reynolds or circumvent the requirements of the *Reynolds I* injunction.[2]

Accordingly, I will assume, without deciding, that Reynolds has met his burden of showing that his protected conduct was a substantial or motivating factor in the alleged adverse actions. After a plaintiff has met that burden, "[t]he burden . . . shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation." *Gayle*, 313 F.3d at 682 (citing *Graham*, 89 F.3d at 80). "The defendant can meet

---

[2] Reynolds also includes a declaration from a locksmith who averred that the screwdriver found in Reynolds's cell could not be used as an escape tool. *See* P.'s Ex. 4, Doc. No. 129-3. That submission could support the inference that Reynolds did not pose a genuine risk of escape by virtue of his possession of that screwdriver. The defendants, however, object to Reynolds's inclusion of the locksmith's declaration because, they contend, it is unsworn expert testimony, does not meet hearsay exceptions, was not previously disclosed to the defendants, and was obtained after the defendants' filing of the motion for summary judgment. Doc. No. 136 at 4. I do not rely on the locksmith's declaration in my ruling. Even if I were to consider that declaration, my ruling would not change because, regardless, I assume *arguendo* that Reynolds has met his initial burden of showing causation for retaliation.

this burden by demonstrating that there is no dispute that the plaintiff 'committed the most

serious, if not all, of the prohibited conduct charged in the misbehavior report.'" *Id.* (quoting

*Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir.) (per curiam), *cert. denied*, 525 U.S. 907 (1998));

*see also Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994) ("[T]he conclusion that the state

action would have been taken in the absence of improper motives is readily drawn in the context

of prison administration where we have been cautioned to recognize that prison officials have

broad administrative and discretionary authority over the institutions they manage.") (cleaned up

and citations omitted).

Reynolds has not disputed the facts supplied by the defendants regarding his phone calls,

which indicate that he was conspiring to smuggle contraband into the prison. *See supra* Section

III.A. Based on the timeline of the investigation into Reynolds and the information that

investigation uncovered, coupled with the prison administration context of this case, I conclude

that no trier of fact can determine that the defendants did not meet their burden of showing that

Reynolds "would have received the same punishment even absent the retaliatory motivation."

*Gayle*, 313 F.3d at 682; *see also Lowrance*, 20 F.3d at 535. Accordingly, the defendants' motion

for summary judgment on Reynolds's retaliation claim is granted.

D. Equal Protection

The defendants also move for summary judgment on Reynolds's equal protection claim.

1. *Whether Class of One Claim is Barred by* Engquist

The defendants chiefly argue that Reynolds's equal protection claim is "not cognizable

due to the discretionary decision-making inherent in the management of prisons and treatment of

prisoners." Doc. No. 122-1 at 25 (quoting *Glassey v. Ryan*, 2016 U.S. Dist. LEXIS 195051, at

*8-9 (D. Ariz. Mar. 7, 2016)). In support of that argument, the defendants rely on *Engquist v.*

*Oregon Dept. of Agr.*, 553 U.S. 591 (2008). In *Engquist*, the Supreme Court held that a

terminated employee's class of one equal protection claim was not cognizable. *See id.* The Court

wrote:

> There are some forms of state action, however, which by their nature
> involve discretionary decisionmaking based on a vast array of subjective,
> individualized assessments. In such cases the rule that people should be
> 'treated alike, under like circumstances and conditions' is not violated
> when one person is treated differently from others, because treating like
> individuals differently is an accepted consequence of the discretion
> granted. In such situations, allowing a challenge based on the arbitrary
> singling out of a particular person would undermine the very discretion
> that such state officials are entrusted to exercise.

*Id.* at 603.

The defendants cite to cases within this district in which *Engquist* was applied to bar

class of one equal protection claims in the prison context. *See, e.g.*, *Ashby v. Quiros*, 2018 U.S.

Dist. LEXIS 215630, at *24 (D. Conn. Dec. 20, 2018) (applying *Engquist* to incarcerated

plaintiff's prison employment equal protection claim); *Barber v. Perdue*, 2012 WL 5996342, at

*8 (N.D.N.Y. Nov. 9, 2012), *report and recommendation adopted*, 2012 WL 5996866 (N.D.N.Y.

Nov. 30, 2012) (applying *Engquist* to bar equal protection claim regarding inmate assignment

because "[u]nder Program Statement 5100.08, the BOP is invested with considerable latitude

concerning assignment of inmates, subject only to the statutory requirement that certain factors

be taken into consideration when making that significantly subjective determination.").[3] Indeed,

although *Engquist* concerned the employment context, the Second Circuit has applied it to non-

employment contexts. *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 142 (2d Cir.

2010). The Second Circuit, however, has also held that *Engquist* does not "bar *all* class-of-one

---

[3] The defendants also cite *Dunlea v. Federal Bureau of Prisons*, 2010 WL 1727838 (D. Conn. Apr. 26, 2010), but that case was abrogated by the Second Circuit's decision in *Analytical Diagnostics Lab*. *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 141 (2d Cir. 2010) (discussing *Dunlea*'s application of *Engquist* as "without persuasive analysis"). Contrary to *Dunlea*, the Second Circuit in *Analytical Diagnostics Lab* makes clear that plaintiffs are not required to make a showing that the difference in treatment flowed from non-discretionary action in order to state a class of one equal protection claim. *Id.*

claims involving discretionary state action." *Id*. (emphasis added). When determining whether *Engquist* applied in *Analytical Diagnostic Labs*, the Second Circuit considered whether the agency "possess[ed] unfettered discretion" with respect to the conduct at issue in that case, the suspension of a license. *Id*. at 142. Because the agency could not "revoke existing licenses without a hearing, . . . [t]he hearing's outcome could further be challenged in an Article 78 proceeding, . . . [the agency] must operate within the regulatory framework set forth in the [state statute], and the actions of its officials are reviewed under a qualified immunity standard, not an absolute immunity standard," the Second Circuit held that *Engquist* did not bar the class-of-one claim. *Id*. at 142-43.

Applying that analysis to the case before me, I conclude that the DOC does not have "unfettered discretion" with respect to Reynolds's treatment. *See id*. at 142. The defendants are correct in contending that, in general, courts "accord substantial deference" to prison officials "on matters of prison administration." *Reynolds v. Quiros*, 25 F.4th 72, 88 (2d Cir. 2022) (citations omitted). The Second Circuit decision in *Reynolds I*, however, makes it clear that that discretion is not "unfettered." In *Reynolds I*, the Second Circuit held that the DOC's classification of Reynolds violated his Fourteenth Amendment right to equal protection, and the Second Circuit affirmed certain portions of my permanent injunction regarding Reynolds's classification and conditions of confinement. *See Reynolds I*, 990 F.3d at 302 (affirming in part "injunction with respect to its provisions: (1) enjoining DOC from enforcing Section 18-10b in Reynolds' case; (2) directing DOC to house Reynolds in conditions similar to those of Johnson and Santiago; and (3) requiring DOC to provide Reynolds with a meaningful individualized classification determination"). Thus, the defendants do not possess unfettered discretion with respect to their treatment of Reynolds because they are required to abide by a court injunction

when classifying him and housing him. Accordingly, Reynolds's equal protection claim overcomes the hurdle of *Engquist*.

### 2. *Sufficiency of Comparators*

The defendants further move for summary judgment on Reynolds's equal protection claim on the ground that Reynolds's comparators are not similarly situated to him. Reynolds brings two class of one claims—one concerning the confiscation of his property, and one concerning his High Security classification. *See* Doc. No. 127-1 at 50.

"To state a valid equal protection 'class of one' claim," an incarcerated plaintiff must claim "first, that he has been intentionally treated differently from others similarly situated and, second, that there is no rational basis for the difference in treatment." *Davila v. Messier*, 2014 WL 4638854, at *9 (D. Conn. Sept. 17, 2014); *see also Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). "The Second Circuit has interpreted [the similarly situated] requirement strictly, requiring an 'extremely high' level of similarity between the plaintiff and the similarly situated comparison group." *Page v. Lantz*, 2007 WL 1834519, at *6 (D. Conn. June 25, 2007). Furthermore, "[r]ational basis review places the burden of persuasion on the party challenging a law, who must disprove 'every conceivable basis which might support it.'" *Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)), *aff'd*, 570 U.S. 744 (2013).

With respect to Reynolds's property confiscation claim, the defendants argue that Reynolds is not similarly situated to Jusino, Santiago, Johnson, Smith, Harris, and Rizzo because those inmates had classification statuses that differed from Reynolds's status during the relevant timeframe. *See* Doc. No. 122-1 at 28. Furthermore, the defendants contend that the other inmates had not committed the infractions for which Reynolds was disciplined—namely the conspiracy

to convey marijuana into the prison. *Id*. at 29 Reynolds concedes that, as a High Security inmate, his status differed from the statuses of Jusino, Santiago, Smith, Harris, and Rizzo. *See* Doc. No. 127-1 at 52. However, because Reynolds also argues that his placement on High Security was itself retaliatory, Reynolds asks that the Court "first make a determin[ation] whether [Reynolds's] High Security status was a retaliation before addressing his Equal Protection property claims." *Id*. at 52. Because I have already determined that Reynolds's retaliation claim fails as a matter of law, I conclude that Jusino, Santiago, Smith, Harris, and Rizzo are not similarly situated to Reynolds for the purpose of Reynolds's property equal protection claim.

The defendants further contend that Reynolds is not similarly situated to Silva with respect to Reynolds's High Security placement claim because "Silva did not have a screwdriver or a lighter or a DVD with pornography or an external hard drive." *Id*. at 29. Reynolds responds by arguing that Silva, like Reynolds, was determined to have "an active role in the conspiracy to convey contraband." Doc. No. 127-1 at 51. The defendants, however, did not extensively search Silva's cell the way they searched Reynolds's cell. As a result, Reynolds argues that the defendants' "differential treatment of Mr. Reynolds and Mr. Silva is self-serving, because they are using it as a basis to claim that the two are not alike." *Id*.

Even though the defendants had evidence that both Reynolds and Silva were substantially involved in the conspiracy, the record shows that Reynolds and Silva were not "prima facie identical." Through phone monitoring, DOC officers overheard conversations between Reynolds and his sister and his nephew. *See* Def.'s Ex. K-1, Doc. No. 125 at 7-16. In those phone conversations, Reynolds appeared to instruct his nephew to obtain a hard drive and edible marijuana for Reynolds and to send the items to Reynolds's son Paul. *See id.* at 9, 16. During his conversations with his nephew, Reynolds referenced an individual called "21" and mentioned

needing to pay that person. *See, e.g.*, *id.* at 8. Reynolds also referenced an individual named

"Debbie," and Reynolds and his nephew discussed how his nephew was in communication with

"Debbie" and would pay her. *See, e.g.*, *id.* at 12, 45; *see also* Def.'s Ex. S, Doc. No. 126 at 13.

After several of those conversations, on March 15, 2021, DOC staff conducted a strip search of

Reynolds and did not find any contraband on him. *See* Def.'s Ex. K-1, Doc. No. 125 at 17-20.

That same day, Reynolds received a disciplinary report for conspiracy to convey contraband. *See*

Def.'s Ex. S, Doc. No. 126 at 79. Reynolds's hard drive was confiscated on March 17, 2021. *See*

Def.'s Ex. X, Doc. No. 123-34. Additional disciplinary reports were issued to Reynolds on

March 17 and March 18, 2021. *See* Def.'s Ex. Y, Doc. No. 123-35 (for medication possession);

Def.'s Ex. Z, Doc. No. 123-36 (for disk with pornographic movie downloaded on it). On March

24, 2021, Reynolds was placed on High Security status. *See* Def.'s Ex. AA, Doc. No. 123-37 at

1.

On March 16, 2021, an officer reviewed calls that had previously been made by Silva.

Silva had made a call on March 15, 2021, in which he instructed his mother not to send certain

items from his "cousin." *See* Def.'s Ex. K-1, Doc. No. 125 at 21. Silva then provided his mother

with his "cousin's" phone number—and the number he gave his mother belonged to Paul,

Reynolds's son. *See id.* Officers concluded that "[t]his was a clear attempt by inmate Reynolds to

reach out to [his nephew] so that he would not send the drugs." Def.'s Ex. S, Doc. No. 126 at 39.

Also on March 15, 2021, Silva called an individual and had them "send a text message to a

person of interest who is involved in the aforementioned investigation" in order to "halt items

from being sent from one person of interest to another who would then ship them into the facility

to another inmate." Def.'s Ex. K-1, Doc. No. 125 at 50. Based on that call, the officer determined

that Silva "played an active role" in the conveyance of the contraband. *See id.*

The DOC has identified "721" and "21" but appears to have dropped the investigation into that individual. Def.'s Ex. S, Doc. No. 126 at 15-16. When officers searched Reynolds's cell on March 15, 2021, they discovered "a piece of paper with '721' and the phone number [redacted] written next to it." *Id.* at 13-14, 55. An online search of that phone number identified one of the correctional officers as the individual behind that phone number. *See id.* at 14. DOC officials conducted an interview with the officer, in which he admitted that the phone number was his. *Id.* at 16, 23. He also admitted to knowing Reynolds and Silva, but he denied knowing their relatives. *Id.* at 24-28. In his report on the investigation, the DOC investigator stated that due to lack of "video footage, witnesses, and limited information to corroborate the allegations," the allegations that the correctional officer conveyed contraband are "unsubstantiated." *Id.*

Silva was sufficiently involved in the conspiracy such that he was able to contact a member of the conspiracy and make sure that one person did not send items to another person of interest "who would then ship them into the facility to another inmate." Def.'s Ex. K-1, Doc. No. 125 at 50. Even so, the facts on the record all point to Reynolds as a—or perhaps even the— leader of the conspiracy. For example, Silva's reliance on Reynolds's son for the contraband indicates that Reynolds had a more significant role in the conspiracy than Silva did. Furthermore, Silva made no mention of any other individual who would need to be paid—neither a "Debbie" nor a "21." By contrast, unlike Silva, Reynolds referenced exchanges with and payments to a "Debbie" and a "21"—suggesting that Reynolds was the one who paid a smuggler inside the DOC. That kind of communication and instruction signifies significant involvement and authority within a conspiracy. I therefore conclude that Silva was not similarly situated to Reynolds.

Accordingly, because Reynolds has not set forth sufficient comparators, the defendants' motion for summary judgment on Reynolds's equal protection claim is granted.

### E. Due Process

The defendants also move for summary judgment on Reynolds's due process claim. The Due Process Clause of the Fourteenth Amendment protects individuals against deprivations of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV. A state therefore cannot deprive a citizen of "life, liberty, and property . . . except pursuant to constitutionally adequate procedures." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). To prevail on his due process claim, Reynolds would need to prove two elements: first, that "there exists a liberty or property interest of which [he] has been deprived, and if so" that "the procedures followed by the State" were constitutionally insufficient. *Green v. Caron*, 2021 WL 2723112, at *2 (D. Conn. July 1, 2021) (quoting *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (per curiam)).

#### 1. *Liberty or Property Interest*

The defendants argue that Reynolds had no property or liberty interest that would trigger due process protections with respect to his lack of an "assessment" at MacDougall-Walker and lack of a hearing regarding his High Security classification. *See* Doc. No. 122-1 at 31-32.

To the extent that Reynolds's due process claim relates to the deprivation of his property, Reynolds's due process rights were not violated by that deprivation. Although Reynolds may have a property interest with respect to the property items in his cell that he was permitted to possess, the Second Circuit has held that "[a] prisoner's due process rights are not violated by the unauthorized destruction or damage of property by the state, if 'the state makes available a meaningful postdeprivation remedy.'" *Riddick v. Semple*, 731 F. App'x 11, 13 (2d Cir. 2018)

(quoting *Hudson v. Palmer*, 468 U.S. 517, 531 (1984)). Indeed, as recognized in *Riddick*, "Connecticut provides inmates with a remedy for lost or destroyed property: a prisoner can file a claim with the Board, and, if it is denied, subsequently file a claim with the Office of the Connecticut Claims Commissioner . . ., which may order relief or authorize suit." *Id.*; *see also* Administrative Directive 9.6(9), *available at* https://portal.ct.gov/DOC/AD/AD-Chapter-9; Conn. Gen. Stat. § 4-142. Reynolds therefore cannot assert a due process claim based on deprivation of his property.

   To the extent that Reynolds's due process claim concerns his High Security classification or lack of assessments, he does not possess a liberty or property interest for that claim. The Supreme Court has held that although "prisoners do not shed all constitutional rights at the prison gate," not "every state action carrying adverse consequences for prison inmates automatically activates a due process right." *Sandin v. Conner*, 515 U.S. 472, 485 (1995); *see also Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976). For example, prisoners do not have a protected property interest in a job assignment. *Johnson v. Rowley*, 569 F.3d 40, 44 (2d Cir. 2009). Reynolds therefore does not have a protected property interest in any particular job assignment stemming from his classification. Moreover, an incarcerated person does not generally have a liberty interest in a discretionarily assigned classification or transfer. *See Torres v. Howell*, 2006 WL 1525942, at *15 (D. Conn. May 30, 2006) (collecting cases); *see also Meachum v. Fano*, 427 U.S. 215, 225 (1976). Additionally, courts within this circuit have held that a state's "failure to follow its own regulations does not itself rise to the level of a constitutional violation." *Perry v. Maloney*, 2021 WL 6127070, at *3 (S.D.N.Y. Dec. 27, 2021); *see also Vega v. Lantz*, 596 F.3d 77, 83 (2d Cir. 2010); *Taylor v. Santana*, 2007 WL 737485, at

*6 (S.D.N.Y. Mar. 6, 2007), *aff'd sub nom. Taylor v. Comm'r of New York City Dep't of Corr.*, 317 F. App'x 80 (2d Cir. 2009).

A prisoner's classification could indirectly implicate a liberty interest to the extent that the classification leads to the imposition of an atypical and significant hardship. In *Sandin*, the Supreme Court clarified the "liberty interest" prong of due process analysis, writing that "States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84 (internal citations omitted); *see also Wilkinson v. Austin*, 545 U.S. 209, 223 (2005) ("After *Sandin*, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is . . . the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'"); *Palmer v. Richard*s, 364 F.3d 60, 64 (2d Cir. 2004) ("A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life' . . . Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.'") (internal citations omitted).

Nevertheless, Reynolds does not provide facts from which I can infer that placement on High Security status results in atypical and significant confinement conditions. Reynolds relies

on *Shand v. Parsons*, in which the court had determined that a plaintiff plausibly alleged confinement in conditions imposing an atypical and significant hardship. 2022 WL 2981593 (D. Conn. July 28, 2022). But the facts that the plaintiff in *Shand* alleged differ from the facts on the record in instant case. In *Shand*, the court interpreted the plaintiff to have alleged the following conditions:

> Plaintiff has alleged facts indicating that the punitive segregation conditions were both harsh and differed from those of the general population: he was placed in a small cell with only a mattress, blankets, and pillow; was permitted to eat his meals only in his cell; was afforded only one hour of recreation outside of his cell per day and was placed in full restraints whenever removed from his cell; had limited opportunity to shower and was required to wear leg irons in the shower; had no nonprivileged telephone calls or mail; had no social visits or access to commissary, employment, or congregate programs; and had difficulty procuring from the correctional staff essential personal hygiene items such as running water, toilet paper, and soap. He has also alleged that other restrictive status confinements did not limit the inmates' access to programs, telephone calls, mail, showers, and items such as soap and toilet paper.

*Id.* at *6 (internal citations omitted). Not only does the plaintiff in *Shand* allege substantial facts from which the court could infer atypical and significant hardship, but that plaintiff was also proceeding *pro se*, and the court was considering the plaintiff's allegations at the motion to dismiss stage. *See id.*

By contrast, here, the record shows that High Security status inmates are treated in a manner that, although restrictive, is not as atypical and severe as the treatment in *Shand*: high security inmates are moved "a minimum of once every 90 days"; their cells are shaken down at least twice a week; they only have noncontact social visits; and "they are afforded the opportunity to do everything else that other offenders do in general population, just in the confines of their housing unit that they live in." P.'s Ex. 6, Doc. No. 129-5 at 19; *see also* Def.'s Ex. T, Doc. No. 123-30 at 164. Reynolds also avers that some conditions are consistent between

Special Circumstances and High Security status: inmates are escorted or monitored, inmates shall be moved to a new cell every 90 days, cell searches two times per week, non-contact social visits, and in-unit or monitored programs only. *See* Doc. No. 127-1 at 4. Furthermore, although inmates on Special Circumstances have a two-hour recreation limit, inmates on High Security have "an effective out-of-cell limitation of three hours per day plus 20 min per meal, and recreation is in a smaller and worse yard than the one for general population." *Id*. Reynolds does not compare time in isolation under both statuses—a factor that could be relevant to whether the conditions on High Security impose an atypical and significant hardship. *Cf. Colon*, 215 F.3d at 231. In all, the facts on the record suggest that Reynolds's conditions on High Security status are restrictive, but not so restrictive such that they meet the threshold of atypical and significant hardship in comparison to other statuses.

Also relevant to the atypicality determination, Reynolds supplies a list of 75 inmates placed on High Security beginning in early 2021 through early 2023. *See* P.'s Ex. 3, Doc. No. 129-2. That number is not small. Moreover, High Security status is one of several restrictive statuses, and the facts on the record suggest that High Security status is not atypical compared to the other restrictive statuses—meaning that the number of individuals confined in conditions similar to Reynolds's is likely higher than 75. *See* Def.'s Ex. R, Doc. No. 123-28 (listing different types of restrictive statuses). *Cf. Wilkinson,* 545 U.S. at 210, 224 (concluding that the combination of conditions at a particular "supermax facility" imposed an atypical and significant hardship such that petitioners had a liberty interest in avoiding assignment to that facility).

Thus, even reading the record facts in the light most favorable to Reynolds, I conclude that no trier of fact could determine that the High Security conditions imposed an atypical and significant hardship. Accordingly, Reynolds has not established a protected property or liberty

interest in connection with his High Security placement and his lack of assessment at MacDougall-Walker.

The defendants' motion for summary judgment on Reynolds's due process claim is therefore granted.

### F. State Law Claims

Reynolds's amended complaint brought claims for intentional infliction of emotional distress and recklessness. Reynolds, however, did not respond to the defendants' motion for summary judgment on those claims. Accordingly, I deem those claims to be abandoned. *See Bannister v. Luis*, 2022 WL 19402511, at *2 (E.D.N.Y. Oct. 27, 2022) ("A party's failure to respond to contentions raised in . . . a motion for summary judgment generally constitutes abandonment of those claims."), *report and recommendation adopted as modified*, 2023 WL 2325680 (E.D.N.Y. Mar. 2, 2023). The defendants' motion for summary judgment on those claims is granted.

### G. Defendants' Remaining Arguments

Finally, the defendants make three additional arguments in support of their motion for summary judgment—qualified immunity, exhaustion, and personal involvement of certain of the defendants. Because none of Reynolds's claims survives summary judgment, those arguments are moot.

## IV.    Conclusion

For the foregoing reasons, the defendants' motion for summary judgment is **granted**. *See* Doc. No. 122.

The Clerk is directed to close this case.

So ordered.

Dated at Bridgeport, Connecticut, this 22nd day of March 2024.

<u>/s/ STEFAN R. UNDERHILL</u>
Stefan R. Underhill
United States District Judge